UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————— :
                                      :
WILLIAM JAMESON                       :    CIVIL ACTION
                                      :    NO. 02-2802
    v.                                :
                                      :
JOHN J. RIGAS, MICHAEL J.             :
RIGAS, TIMOTHY J. RIGAS,              :
and JAMES P. RIGAS                    :
—————————————————————— :

(Additional Captions Set Forth Below)

**MEMORANDUM OF LAW IN SUPPORT OF THE SPADAFORA GROUP'S MOTION FOR CONSOLIDATION, FOR APPOINTMENT AS LEAD PLAINTIFFS UNDER SECTION 21D(a)(3)(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND FOR APPROVAL OF LEAD PLAINTIFFS' SELECTION OF CO-LEAD COUNSEL**

```
ERNEST PEDATA                      :    CIVIL ACTION
                                   :    NO. 02-2901
           v.                      :
                                   :
JOHN J. RIGAS, MICHAEL J.          :
RIGAS, TIMOTHY J. RIGAS,           :
and JAMES P. RIGAS                 :
_____ :
DAVID SORENSON                     :    CIVIL ACTION
                                   :    NO. 02-3158
           v.                      :
                                   :
JOHN J. RIGAS, MICHAEL J.          :
RIGAS, TIMOTHY J. RIGAS,           :
and JAMES P. RIGAS                 :
_____ :
HAROLD WEINER                      :    CIVIL ACTION
                                   :    NO. 02-3211
           v.                      :
                                   :
JOHN J. RIGAS, MICHAEL J.          :
RIGAS, TIMOTHY J. RIGAS,           :
and JAMES P. RIGAS                 :
_____ :
BRIAN SMITH                        :    CIVIL ACTION
                                   :    NO. 02-3625
           v.                      :
                                   :
JOHN J. RIGAS, MICHAEL J.          :
RIGAS, TIMOTHY J. RIGAS,           :
and JAMES P. RIGAS                 :
_____ :
KURT MEYLE                         :    CIVIL ACTION
                                   :    NO. 02-3699
           v.                      :
                                   :
JOHN J. RIGAS, MICHAEL J.          :
RIGAS, TIMOTHY J. RIGAS,           :
and JAMES P. RIGAS                 :
_____ :
JEFFREY J. HYSLIP                  :    CIVIL ACTION
                                   :    NO. 02-3768
           v.                      :
                                   :
JOHN J. RIGAS, MICHAEL J.          :
RIGAS, TIMOTHY J. RIGAS,           :
and JAMES P. RIGAS                 :
_____ :

SCOTT BURNSIDE                     :    CIVIL ACTION
                                   :    NO. 02-3769
```

```
        v.                        :
                                  :
JOHN J. RIGAS, MICHAEL J.         :
RIGAS, TIMOTHY J. RIGAS,          :
and JAMES P. RIGAS                :
_____:
WILLIAM H. SPADAFORA              :   CIVIL ACTION
                                  :   NO. 02-3858
        v.                        :
                                  :
JOHN J. RIGAS, MICHAEL J.         :
RIGAS, TIMOTHY J. RIGAS,          :
and JAMES P. RIGAS                :
_____:
FEIVEL GOTTLIEB RESTATED          :   CIVIL ACTION
DEFINED BENEFIT TRUST             :   NO. 02-4486
                                  :
        v.                        :
                                  :
JOHN J. RIGAS, MICHAEL J.         :
RIGAS, TIMOTHY J. RIGAS,          :
and JAMES P. RIGAS                :
_____:
```

## MEMORANDUM OF LAW IN SUPPORT OF THE SPADAFORA GROUP'S MOTION FOR CONSOLIDATION, FOR APPOINTMENT AS LEAD PLAINTIFFS UNDER SECTION 21D(a)(3)(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND FOR APPROVAL OF LEAD PLAINTIFFS' SELECTION OF CO-LEAD COUNSEL

### PRELIMINARY STATEMENT

William H. Spadafora, Thomas Tarla, Dallas Beecham and Carrol Beene ("Spadafora Group" or "Proposed Lead Plaintiffs" or "Movants") collectively have lost $280,125.86 as a result of their purchases of the common stock of Adelphia Business Solutions, Inc. ("ABIZ" or the "Company"). On an individual basis, the Movants' losses are significant: William H. Spadafora lost $100,949.86, Dallas Beecham lost $89,322.50, Thomas Tarla lost $66,741.50, and Carrol Beene lost $23,112.00. Movants respectfully submit this Memorandum in support of their motion for: (i) appointment as Lead

3

Plaintiffs pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or the "Act");(ii) approval of their selection of Berger & Montague, P.C. ("Berger & Montague") and Schatz & Nobel, P.C. ("Schatz & Nobel") as Co-Lead Counsel for the class, and (iii) consolidation of the above-captioned actions.

Movants are believed to be the investors with the largest financial interest in the outcome of the case.[1]  Each has a substantial stake in the outcome of this case and will vigorously represent the interests of the class.  Each has signed a certification attesting to his willingness and qualification to

---

[1]    The Proposed Lead Plaintiffs' losses for purposes of the current motion are not the same as their legally compensable damages, measurement of which is often a complex legal question which cannot be determined at this stage of the litigation.  The approximate losses can, however, be determined from the enumeration of trading data, as set forth in the sworn certifications of the Proposed Lead Plaintiffs and based upon information concerning the market prices for the Company's common stock.

Damages for common stock were calculated by taking the difference between the purchase price and the sale price (or settle out price where the common stock was retained as of the last date of the Class Period).  The settle out price used for calculating damages for common stock was $0.00, as the Company filed for bankruptcy protection on March 27, 2002.

The Proposed Lead Plaintiffs' Class Period transactions in ABIZ are set forth in the certification forms, which are attached as Exhibit A to the Declaration of Robin Switenbaum("Switzenbaum Decl.") submitted herewith.  A chart setting forth the Proposed Lead Plaintiffs' losses are set forth at Exhibit B, Switzenbaum Decl.

participate as a Lead Plaintiff in this action. <u>See</u> Switzenbaum Decl. Exhibit "A". As such, Movants meet the requirements of the PSLRA for appointment as Lead Plaintiffs.

Moreover, the Proposed Lead Plaintiffs satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure in that their claims are typical of the claims of the class and they will fairly and adequately represent the interests of the class. They have retained competent, experienced and nationally recognized counsel with extensive experience and expertise in securities fraud and other class actions to prosecute this securities litigation. They seek this Court's approval of their selection of Co-Lead Counsel in order to zealously advance the interests of the class in this litigation.

As further discussed below, the Proposed Lead Plaintiffs have satisfied each of the requirements of the PSLRA and, therefore, are best qualified for appointment as Lead Plaintiffs, and their choice of counsel should be accepted by this Court.

<u>**STATEMENT OF FACTS**</u>[2]

Pending before this Court are ten securities class action lawsuits by purchasers of ABIZ stock which have been filed against

---

[2]    The Statement of Facts is taken from <u>Sorenson v. John J. Rigas, et al.</u>, Civil Action No. 02-CV-3158 (HJH) filed by Berger & Montague and Schatz & Nobel which is substantially similar to each of the other complaints filed against Defendants.

defendants John J. Rigas, Timothy Rigas, James P. Rigas and Michael J. Rigas (collectively, the "Defendants"). The underlying cases are securities fraud class actions alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").

ABIZ provides integrated telecommunications services to businesses, governmental and educational customers. Defendants were the senior officers and/or directors of ABIZ. Prior to January 11, 2002, the Company was a majority owned (79%) subsidiary of Adelphia Communications Corporation ("Adelphia Communications"). On January 11, 2002, Adelphia Communications distributed all of its shares of ABIZ stock to the shareholders of Adelphia Communications. As a result, Defendants were controlling stockholders of ABIZ whether (i) by their majority ownership interest in Adelphia Communications prior to the distribution of Adelphia Communications' ownership interest in ABIZ or (ii) as majority stockholders of ABIZ Solutions after the distribution of Adelphia Communications' interest. On March 27, 2002, ABIZ filed for Chapter 11 Bankruptcy and thus was not named as a defendant in this action.

**A.   <u>Inflated Line Counts and Improper Billing Practices</u>**

During the Class Period, Defendants portrayed ABIZ as a growing telecommunications business. Among other things, the market viewed the number of new customers that ABIZ assigned to its

available telecommunications lines in its various regions of service as indicative of the Company's growth.  These "line counts" were important statistics reflecting the new business and growth of the Company.  Likewise, the number of customers who retained their lines (*i.e.*, those that did not terminate or disconnect service) was significant in arriving at a net line count (*i.e.*, new lines minus terminated/disconnected lines) for ABIZ.

Defendants emphasized ABIZ's growth by publicizing the Company's line count statistics.  At the commencement of the Class Period, on January 6, 2000, Defendants caused ABIZ to issue a press release announcing that the Company estimated it had:

> sold approximately 87,570 new access lines and installed approximately 80,200 new access lines during the fourth quarter ended December 31, 1999.  For the year ended  December 31, 1999, the Company estimates that it has sold approximately 221,000 new access lines. As of December 31, 1999, the Company estimates that its has a total of approximately 331,000 access lines installed, of which approximately 55% were provisioned on its own network (on-switch).

In each of ABIZ's subsequent quarterly reports on Form 10-Q during the Class Period, Defendants continued to cause ABIZ to report false and misleading line counts as follows:

| New Lines Sold | New Lines Installed | Time Period | Source (date) |
|---|---|---|---|
| 87,570 | 80,202 | Quarter ending December 31, 1999 | 10-K (March 30, 200) |
| 72,572 | 81,165 | Quarter ending March 31, 2000 | Press Release (May 9, 2000) |
| 72,268 | 81,460 | Quarter ending June 30, 2000 | Press Release (August 9, 2000) |
| 103,139 | 83,225 | Quarter ending September 30, 2000 | Press Release (November 9, 2000) |

However, the Defendants knew or were deliberately reckless in disregarding that the levels of ABIZ's line counts being publicly reported were grossly overstated because of the following widespread practices at the Company that were either instituted or condoned by Defendants:

(a) Adding hundreds of lines to existing customers who never ordered them and disconnecting the lines within the same month without reporting the disconnect/ termination. This practice, known as "cramming," artificially inflated ABIZ's reported line counts. Customers were usually unaware of the additional lines because, since the service was terminated in the same month, they were never billed.  This practice resulted in ABIZ's artificially inflated line counts.

(b) Businesses were entered into the system as "new customers" even though the businesses had never signed up for service with ABIZ.  ABIZ would then either disconnect the lines in the same month without reporting the disconnection or simply throw away the bills.  This practice, known as "slamming," added to the inflated line counts publicly reported by Defendants.

(c) Businesses with bad credit histories with other telecommunications companies or with ABIZ were entered as "new lines" when the businesses had not ordered new service or were known to be unable to pay for new service.

(d) ABIZ customers who had disconnected all or a portion of

their lines were still being retained on ABIZ systems as customers and being billed for the disconnected lines.

At year end 2000, Defendants were forced to begin addressing some of the accounting problems created by their false and deceptive sales and line count practices. Specifically, for the quarter ending December 31, 2000, Defendants caused ABIZ to take a charge of $15 million for "potentially uncollectible accounts receivable associated primarily with Internet service providers." No disclosure however was made during the Class Period of the false sales practice or of the total effect of the sales practices on ABIZ's business, and specifically, the collectibility of its accounts receivable. Instead, Defendants concealed that many of the "lines" connected to ABIZ's system were the result of slamming or cramming or other improper sales practices. Throughout the Class Period, Defendants inflated ABIZ's reported level of line counts, reported revenues and accounts receivable to the detriment of the investing public.

**B.** **Inflated Contribution to Adelphia Communications' Corporate Overhead**

Defendants caused ABIZ to enter into various agreements with Adelphia Communications for services and other items pursuant to which ABIZ would be obligated under certain circumstances to make payments to Adelphia Communications. In addition, Defendants obligated ABIZ to share corporate overhead services and other

business expenses and services with Adelphia Communications. However, the investing public was not informed that these payments to Adelphia Communications and sharing of corporate expenses were handled in a completely arbitrary manner without regard to the actual expenses incurred by ABIZ. Rather, Defendants arbitrarily decided based on the financial needs of Adelphia Communications and their family controlled entities as to how to allocate expenses and payment obligations. Defendants misleadingly caused ABIZ to represent to investors that its corporate overhead expenses were allocated with some reasonable relationship to ABIZ's actual expenses and usage of overhead services. Among other things, ABIZ engaged in the following practices:

(a) ABIZ and Adelphia Communications failed to properly document labor, operating, equipment, circuit network and other costs to the appropriate legal entities. Where employees worked in part for ABIZ, their time was not fully or accurately charged/recorded to ABIZ;

(b) Software applications licensed from Remedy, Microsoft, Veritas and Oracle have been provided by Adelphia Communications to ABIZ with no or inadequate accounting and licensing documentation, including proper notice to the manufacturer;

(c) Hardware and network circuits have been used and routed to ABIZ from Adelphia Communications or other entities with no or inadequate accounting documentation;

(d)  Office space (rooms, etc.) were utilized by ABIZ in Coudersport, Pennsylvania in buildings or spaces shared with Adelphia Communications without any or with inadequate documentation and accounting; and

(e)  Powerlink network sales, support, accounting and provisioning services were shared with Adelphia Communications with no or inadequate accounting documentation.

As a result, during the Class Period, because of Defendants' personal direction of a labyrinth of public and private entities, Defendants caused ABIZ to overpay expenses and corporate overhead to Adelphia Communications.

**C.  Adelphia Communications' Undisclosed Off-Balance Sheet Liabilities Limits ABIZ's Borrowing Capabilities**

The telecommunications business which ABIZ conducted during the Class Period was capital intensive.  ABIZ was heavily dependent on Defendants and Adelphia Communications for support via co-borrowing guarantees. Throughout the Class Period, however the magnitude of Adelphia Communications' debt set forth in ABIZ's filings was understated because Defendants omitted material off-balance sheet liabilities for which they and Adelphia Communications were co-liable.

On March 1, 2002, ABIZ announced that it would not make an interest payment of $15.3 million on certain secured notes of the Company and that it, therefore, would be in default of the notes.

On March 27, 2002, Adelphia Communications announced its

results for the fourth quarter for the year ended December 31, 2001.  In a conference call following the announcement of financial results, Defendants and Adelphia Communications announced that they had off-balance sheet financing arrangements which obligated Adelphia Communications for approximately $2.3 billion in debt. On the same day, March 27, ABIZ announced that it had filed for Chapter 11 bankruptcy protection.  On May 2, 2002, Adelphia Communications further disclosed that it would likely restate Adelphia Communications' borrowings in its financial statements to increase them by a total of $3.5 billion:  $1.6 billion, as of December 31, 2001; $1.2 billion as of December 31, 2000; and $700 million as of December 31, 1999.

During the Class Period, Defendants had the responsibility to maintain sufficient controls to accurately report ABIZ's debt arrangements and financial results.  By failing to disclose in ABIZ's discussions of its liabilities that Adelphia Communications (on whom ABIZ was dependent) had in excess of admittedly $3.5 billion in off-balance sheet debt, Defendants mislead the market as to ABIZ's continued viability and ability to obtain additional funding.

As a result of Defendants' intentional and/or reckless public misrepresentations and omissions of material adverse information, the Proposed Lead Plaintiff and members of the Class purchased ABIZ common stock at artificially inflated prices during the Class

Period and were damaged thereby.  Each of the Defendants either knew or recklessly disregarded that these statements and omissions delineated in Plaintiffs' complaints were false and misleading; that such statements would adversely affect the integrity of the market for ABIZ common stock; and that such statements would deceive investors into purchasing ABIZ common stock at artificially inflated prices.  Stated simply, the picture painted by Defendants regarding ABIZ during the Class Period concerning its financial performance was far different than the reality.

## I.
## SPADAFORA GROUP SHOULD BE APPOINTED LEAD PLAINTIFFS

### a.   The Procedures Mandated by the PSLRA

The PSLRA, which amended Section 21D of the Exchange Act, sets forth the specific procedures governing the appointment of Lead Plaintiff(s) and Lead Counsel in securities class action cases.  15 U.S.C. §78u-4(a)(1) and (a)(3)(B)(i).

Pursuant to Section 21D, the plaintiff(s) who files the initial action must, within twenty days thereof, publish a notice informing putative class members of their right to file a motion for appointment as Lead Plaintiff.  15 U.S.C. §78u-4(a)(3)(A)(i). Within sixty days of the publication of the notice, any "person or group of persons" who are members of the putative class may move the court to be appointed as lead plaintiff, whether or not they have previously filed a complaint in the action.  15 U.S.C. §78u-4(a)(A) and (B).

Here, counsel in the first-filed action caused the first notice to be published via *Business Wire* on May 13, 2002. <u>See</u> Switzenbaum Decl., Exhibit C.[3]  The notice identified the various Defendants and the case number, described the claims, delineated the Class Period, provided a link to a computer web site on which a copy of the complaint could be viewed, and informed the purchasers of ABIZ common stock during the Class Period of their right to seek to serve as Lead Plaintiff by filing a motion no later than June 9, 2002.  The Proposed Lead Plaintiffs have thus timely filed this motion before the expiration of the 60-day period from such publication.

The PSLRA further provides that within ninety days after publication of the notice, or as soon as practicable after the Court decides any pending motion to consolidate, the Court shall consider any motion made by a putative class member and shall appoint as lead plaintiff the member or members of the class that the Court determines to be most capable of adequately representing the interests of the class. 15 U.S.C. §78u-4(a)(3)(B).  In determining who is the "most adequate" plaintiff, the Act provides that:

---

[3]    <u>Sorenson v. Adelphia Communications</u>, Civil Action No. 02-CV-3158 was subsequently filed by Berger & Montague and Schatz & Nobel.  Berger & Montague and Schatz & Nobel each issued a similar notice which are also attached as Exhibit C.  The notices provided a link to their computer web sites on which a copy of the <u>Sorsenson</u> Complaint could be viewed.

> [T]he court shall adopt a presumption that the
> most adequate plaintiff in any private action
> arising under this title is the <u>person or
> group of persons</u> that --
>
> (aa) has either filed the complaint or
> made a motion in response to a notice ...
>
> (bb) <u>in the determination of the court,
> has the largest financial interest in the
> relief sought by the class</u>; and
>
> (cc) otherwise satisfies the requirements
> of Rule 23 of the Federal Rules of Civil
> Procedure.

15 U.S.C. §78u-4(a)(3)(B)(iii) (emphasis added). <u>See</u> <u>generally</u>

<u>Greebel v. FTP Software</u>, 939 F.Supp. 57, 64 (D. Mass. 1996).

As is evident from the statutory language, a group of lead

plaintiffs may be appointed under the Act, and numerous courts have

appointed lead plaintiff groups of varying sizes. <u>See</u>, <u>e.g.</u>, <u>In re</u>

<u>Cendant Corp. Litigation</u>, 264 F.3d 201, 266 (3rd Cir. 2001);

<u>Laborers Local 1298 Pension Fund v. Campbell Soup Co.</u>, 2000 U.S.

Dist. LEXIS 5481 (D.N.J. 2000); <u>In re Rite Aid Corp. Sec. Litig.</u>,

No. 99-CV-1349 (E.D. Pa. June 3, 1999) (Exhibit "F" to Switzenbaum

Decl.); <u>In re Milestone Scientific Securities Litigation</u>, 183 F.R.D.

404, 416 (D.N.J. 1998); <u>In re Oxford Health Plans</u>, 182 F.R.D. 42, 46

(S.D.N.Y. 1998), <u>D'Hondt v. Digi International</u>, 1997 WL 405668 (D.

Minn. 1997); <u>In re Cephalon Sec. Litig.</u>, No. 96-CV-0633, 1996 U.S.

Dist. LEXIS 13492, at *2 (E.D. Pa. Aug. 27, 1996) ("Clearly, the Act

does not preclude appointing more than one lead plaintiff.").

In the instant litigation, the appointment of the Spadafora

Group, a small group of four plaintiffs, would be consistent with the

language of the PSLRA, case law authority, and the SEC's view on the subject.  See Memorandum of SEC, Amicus Curiae attached to the Court's opinion in In re Baan Co. Sec. Litig., 186 F.R.D. 214, 224 (D.D.C. 1999) ("Construing the term 'group of persons' in light of the language and purposes of the Reform Act, a court generally should not approve a group as lead plaintiff unless it is small enough to be capable of effectively managing the litigation and the lawyers.  The Commission believes that ordinarily this should be no more than three to five persons, a number that will facilitate joint decisionmaking and also help to assure that each group member has a sufficiently large stake in the litigation.") (emphasis added).

Here, the Spadafora Group has a collective loss (for present statutory purposes) of over $280,000.  See Switzenbaum Decl., Exhibit "B".  These significant losses demonstrate the Proposed Lead Plaintiffs' compelling stake in the litigation.

Furthermore, as is demonstrated herein, the Proposed Lead Plaintiffs satisfy all of the prerequisites for appointment as Lead Plaintiffs pursuant to section 21D(a)(3)(B).  They have the largest financial interest in the outcome of the litigation known to plaintiffs' counsel of those plaintiffs who purchased common stock and have come forward, and otherwise meet all of the requirements of Rule 23.

b.  **Spadafora Group Satisfies the Requirements of the Act**

A.  **Spadafora Group Believe They Have The Largest Financial Interest In The Relief Sought By The Class**

Based on counsel's knowledge to date, the Spadafora Group possess the largest and most significant financial interest in the outcome of this litigation of those plaintiffs who purchased common stock and have come forward, and, therefore, are presumed to be the "most adequate" plaintiffs. 15 U.S.C. §78u(4)(3)(B) (iii)(I)(bb).

One of the key factors in the selection of a Lead Plaintiff under the PSLRA is the court's determination as to which person or group of persons collectively has the largest financial interest in the relief sought by the class. The "most adequate plaintiff" provision of the PSLRA provides that a court:

> shall appoint as lead plaintiff <u>the member or members of the purported plaintiff class</u> that the court determines to be most capable of adequately representing the interests of class members . . .

15 U.S.C. §78u-4(a)(3)(B)(i) (emphasis added). Moreover, the Court should presume:

> that the most adequate plaintiff in any private action arising under this title is the <u>person or group of persons that</u> --
>
> *  *  *
>
> (bb) in the determination of the court, **has the largest financial interest in the relief sought by the class**

17

15 U.S.C. §78u-4(a)(3)(B)(iii) (emphasis added).

Numerous courts have interpreted this language to mean that the person or group who has the largest financial stake in the litigation, is presumed to be the "most adequate" plaintiff to represent the class. See, e.g., In re Cendant Corp. Litig., 182 F.R.D. 144, 145 (D.N.J. 1998); Lax v. First Merchants Acceptance Corp., 1997 U.S. Dist. LEXIS 11866 at *3 (N.D. Ill. Aug. 6, 1997).

While the PSLRA provides no formula for identifying the movant with the "largest financial interest," the Third Circuit recognized recently that the Court should consider, among other things: (1) the number of shares that the movant purchased during the class period; (2) the total net funds expended by the movants during the class period; and (3) the approximate losses suffered by the movant. In re Cendant Corp. Litig., 264 F.3d 201 (3rd Cir. 2001) at 262, citing Lax v. First Merchants Acceptance Corp., 1997 U.S. Dist. LEXIS 11866 (N.D. Ill. Aug. 6, 1997); In re Nice Sys. Ltd. Secs. Litig., 188 F.R.D. 206, 217 (D.N.J. 1999).[4]

The Proposed Lead Plaintiffs purchased 425,400 shares of ABIZ common stock during the Class Period and sold only 6,000. On an aggregated basis, the Spadafora Group expended $297,223.36 and has suffered total losses (equal to net expenditure) of $280,125.86.

---

[4]    Some courts add a fourth factor – the number of net shares purchased during the class period. See, e.g., Newby v. Enron Corp. (In re Enron Corp. Securities Litigation), 2002 U.S. Dist. LEXIS 3688 at *34 (S.D. Tex. Feb. 15, 2002).

See Switzenbaum Decl., Exhibit "B".  Thus, they have a substantial stake in the litigation.

The legislative history of the PSLRA demonstrates that the Proposed Lead Plaintiff group is precisely the type of plaintiffs Congress sought to encourage to come forward.  "[C]lass members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake."  House Conference Report No. 104-369, 104th Cong. 1st Sess. at 34 (1995). See also, e.g., In re Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d. 39, 42 (D. Mass. 2001); Netsky v. Capstead Mortgage Corp., 2000 WL 964935, at *5 (N.D. Tex. 2000) ("Congress intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more aligned with the class of shareholders, will participate in the litigation and exercise control. . ."); In re Baan Co. Sec. Litig., 186 F.R.D. 214 (D.D.C. 1999).

Based on their significant losses, the Spadafora group will most effectively represent the interests of the plaintiff class and will have the interest and commitment to supervise the litigation. Moreover, they are qualified to represent the proposed Class, and are willing to serve as representative parties.  Two of the four Proposed Lead Plaintiffs are located within this Circuit.

William C. Spadafora is a self-directed investor who lives in Indiana, Pennsylvania and is semi-retired as a partner in several

automobile dealerships.  He maintains a joint account with the right of survivorship with his wife.  In that capacity, he purchased 78,000 shares of ABIZ common stock during the Class Period and suffered a loss of over $100,000.  See Spadafora Certification, Switzenbaum Decl., Exhibit A.  Mr. Spadafora is an experienced businessman who is familiar with litigation.  As such, he is knowledgeable about the responsibilities of serving as a lead plaintiff, and has demonstrated a commitment to overseeing counsel in a vigorous pursuit of class claims.  See, e.g., In re Cendant Corp. Litigation, 264 F.3d 201, 266 (3rd Cir. 2001) ("the goal of the Reform Act's lead plaintiff provision is to locate a person or entity whose sophistication and interest in the litigation are sufficient to permit that person or entity to function as an active agent for the class...").

Thomas Tarla is also retired and can devote the requisite energy to pursuing this litigation.  He is a former accountant with Arthur Andersen.  He has previously given deposition testimony and is thus familiar with the demands of litigation.  He lives nearby in New Jersey.

Dallas Beecham is the owner of Creative Homebuilders, a homebuilder in Mobile, Alabama.  Mr. Beecham purchased 140,000 ABIZ shares for his personal retirement account.  He is thus extremely motivated to be a lead plaintiff.

Carrol Beene owns a landscape business which has contracts

20

with several states, including Texas and Louisiana to maintain public right of ways.  He is also a self-directed investor and purchased 201,400 shares of ABIZ stock during the Class Period based on their apparent book value relative to stock price.  He is also extremely motivated to be a lead plaintiff.

In addition to these individual qualifications, the Proposed Lead Plaintiffs have selected and retained two law firms which are highly experienced in prosecuting securities class actions such as these pending before the Court.  <u>See</u> Resume of Berger & Montague and Schatz & Nobel attached to the Switzenbaum Decl. as Exhibit "D" and "E", respectively.  Accordingly, the Proposed Lead Plaintiffs satisfy the prerequisites for appointment as Lead Plaintiffs under Section 21D(a)(3)(B).

**B.    <u>The Spadafora Group Satisfy The Requirements Of Rule 23</u>**

Section 21(D)(3)(B) of the Exchange Act further provides that, in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff group must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."  Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are met:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the

> claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Of the four prerequisites to class certification, only two ---- typicality and adequacy ---- directly address the personal characteristics of the proposed class representatives.

Consequently, courts have held that at this preliminary stage of the litigation, the inquiry to the typicality and adequacy prongs of Rule 23(a) should be limited, and the examination of the remaining requirements should be deferred until the plaintiff(s) move for class certification. See, e.g., In re Cendant Corp. Litigation, 264 F.3d 201, 264 (3rd Cir. 2001); Gluck v. CellStar Corp., 976 F.Supp. 542, 546 (N.D. Tex. 1997) (finding that "[a] comprehensive reading of the statute reveals that, at this stage of the proceedings, [the proposed lead plaintiff] need only make a preliminary showing that it satisfies the typicality and adequacy requirements"); Chill v. Green Tree, 181 F.R.D. 398, 407 (D. Minn. 1998) ("For purposes [of lead plaintiff analysis] a proposed Lead Plaintiff need only make a preliminary showing that he or she satisfies the typicality and adequacy requirements of Rule 23"). As detailed below, the Spadafora Group meets the typicality and adequacy requirements of Rule 23.

C.    **The Spadafora Group's Claims Are Typical Of The Claims Of The Class**

Generally, the typicality requirement is satisfied if the

claims arise from the same event, practice or course of conduct
that gives rise to the claims of the class members, and are based
on the same legal theory. See Hoxworth v. Blinder, Robinson & Co.,
Inc., 980 F.2d 912, 923 (3rd Cir. 1992); Eisenberg v. Gagnon, 766
F.2d 770, 786 (3rd Cir. 1985); Zinberg v. Washington Bancorp., Inc.,
138 F.R.D. 397, 406-07 (D.N.J. 1990); In re Kirschner Medical Corp.
Sec. Litig., 139 F.R.D. 74, 78-79 (D. Md. 1991).

Indeed, to satisfy typicality, the claims of the class
representatives do not have to be identical to those of the class
members. Eisenberg v. Gagnon, 766 F.3d at 786. The focus of the
typicality inquiry is not plaintiffs' behavior, but defendants'
behavior. In re Electro-Catheter Sec. Litig., [1987-88 Transfer
Binder] Fed. Sec. L. Rep. (CCH) ¶93,643 at 97,931 (D.N.J. 1987).

The Spadafora Group satisfies this requirement because, like
all the other class members, they: (1) purchased ABIZ common stock
during the Class Period; (2) at prices alleged to have been
artificially inflated by the materially false and misleading
statements issued by Defendants and/or by Defendants' failure to
disclose material information; and (3) suffered damages thereby.
Thus, their claims are typical of those of other Class members
since their claims and the claims of the other Class members arise
out of the same course of events. Because the Proposed Lead
Plaintiff Group seeks to prove that their claims "arise from the
same event or practice or course of conduct that give rise to the

claims of the class members," and because those claims are based on the same legal theories, the typicality requirement of Rule 23(a)(3) is satisfied. See <u>Simpson v. Specialty Retail Concepts</u>, 149 F.R.D. 94, 98 (M.D.N.C. 1993).

    D.    <u>**The Spadafora Group Will Fairly And Adequately Represent The Interests Of The Class**</u>

Under Rule 23(a)(4), the representative party must fairly and adequately protect the interests of the class. The adequacy of representation turns on two factors: 1) whether the plaintiff's attorney is qualified, experienced, and generally able to conduct the proposed litigation; and 2) whether the plaintiff has interests antagonistic to the class. See <u>In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 800 (3rd Cir. 1995); <u>Wetzel v. Liberty Mutual Ins. Co.</u>, 508 F.2d 239, 247 (3rd Cir. 1974), <u>cert</u>. <u>denied</u>, 421 U.S. 1011, 95 S.Ct. 2415 (1975); <u>see also</u>, <u>e.g.</u>, <u>Simpson</u>, 149 F.R.D. at 102; <u>Kirshner</u>, 139 F.R.D. at 79.

The Spadafora Group meets both these inquiries. The PSLRA directs this Court to limit its examination of the adequacy of the proposed Lead Plaintiffs to represent the Class to the existence of any conflicts between the interests of the proposed Lead Plaintiffs and the members of the Class, and then allow the Lead Plaintiffs to retain lead counsel to represent the Class, "subject to the approval of the court." See 15 U.S.C. §78u4(a)(3)(B)(v).

The Proposed Lead Plaintiff group's interests are clearly aligned with the members of the Class, and there is no evidence of

any antagonism between their interests and those of the Class. As detailed above, the Spadafora Group shares numerous common questions of law and fact with the members of the Class and their claims are typical of the claims of other Class members. Further, the Spadafora Group has selected two law firms to represent them that are highly experienced in prosecuting securities class actions such as this and whose efforts to date in this action promise vigorous representation of the Class. <u>See</u> Switzenbaum Decl., Exhibit "D" and "E".

**II.**

**THIS COURT SHOULD APPROVE THE PROPOSED LEAD
PLAINTIFF GROUP'S CHOICE OF LEAD COUNSEL**

The PSLRA vests authority in the Lead Plaintiffs, subject to court approval, to select and retain lead counsel. <u>See</u> 15 U.S.C. §78u-4(a)(3)(B)(v); <u>see also</u>, <u>e.g.</u>, <u>Lax v. First Merchants Acceptance Co.</u>, 1997 WL 405668 at *5 (N.D. Ill. Aug. 11, 1997). The Court should not disturb the proposed Lead Plaintiffs' choice of counsel unless necessary to "protect the interests of the [plaintiff] class." 15 U.S.C. §78u4(a)(3)(B)(iii)(II)(aa). <u>See</u> <u>In re MicroStrategy Inc. Sec. Litig.</u>, 110 F.Supp.2d 427, 438 (E.D. Va. 2000) ("The PSLRA plainly states that a district court's duty is to appoint a lead plaintiff based on the relevant statutory criteria . . . it is the lead plaintiff's duty to select and retain counsel to represent the class . . . a district court should approve plaintiff's choice of lead counsel based solely on that counsel's

competence, experience, and resources . . .").

Congress' theory in enacting these provisions "was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff--frequently a large institution or otherwise sophisticated investor--would be motivated to act like a "real" client, carefully choosing counsel and monitoring counsel's performance . . ." In re: Razorfish, Inc. Securities Litigation, 143 F. Supp. 2d. 304, 307 (S.D.N.Y. 2001).

One of the lead plaintiffs' most important functions is to "select and retain" lead counsel. Cendant, 264 F.3d at 265. The Court should not disturb the proposed Lead Plaintiff's choice of counsel unless necessary to "protect the interests of the [plaintiff] class." 15 U.S.C. §78u4(a)(3)(B)(iii)(II)(aa). Indeed, one of the best ways for a Court to ensure that [lead plaintiffs] will fairly and adequately represent the interests of the Class is to inquire whether the movant has demonstrated a willingness and ability to select competent class counsel." Cendant, 264 F.3d 201, 265. Here, lead plaintiffs are seeking the appointment of Berger & Montague and Schatz & Nobel as Co-Lead Counsel.

Berger & Montague is a local firm with over 30 years of experience in securities fraud class action litigation. It has over 55 lawyers and the resources necessary to litigate a major case like this one. Berger & Montague has been repeatedly

26

recognized in this Circuit for its excellent and efficient representation. For example, Judge Stewart Dalzell, at the final settlement hearing of <u>In re U.S. Bioscience Securities Litigation</u>, Civil Action No. 92-0678 (E.D. Pa.), where Sherrie R. Savett served as co-lead counsel, stated on April 4, 1994:

> The quality of lawyering on both sides, but I am going to stress now on the plaintiffs' side, simply has not been exceeded in any case, and we have had some marvelous counsel appear before us and make superb arguments, but they really don't come any better than Mrs. Savett . . ., and the arguments we had on the motion to dismiss [Ms. Savett argued the motion], both sides were fabulous, but plaintiffs' counsel were as good as they come. Transcript pp. 39-40.

Judge Dalzell went on to describe the services of Mrs. Savett as "superb." (Transcript p. 46). <u>See also</u>, <u>In re: Rite Aid Corp. Sec. Litig.</u>, 146 F. Supp.2d 706 (E.D. Pa. 2001) (Dalzell, J.) ("As to 'the skill and efficiency of the attorneys involved,' we can only echo what we said about some of the same lawyers in *U.S. Bioscience.* The results here are outstanding in a litigation that was far ahead of public agencies like the Securities and Exchange Commission and the United States Department of Justice. . . . At the same time, these attorneys have, through the division of their labors, represented the class most efficiently[.]") In <u>In Re: Waste Management, Inc. Securities Litigation</u>, in approving the settlement and attorneys' fees at a hearing held on September 17, 1999, where Sherrie R. Savett served as co-lead counsel, The

Honorable Wayne R. Andersen stated:

> . . . you have acted the way lawyers at their best ought to act. And I have had a host of cases . . . in 15 years now as a judge and I cannot recall a significant case where I felt people were better represented than they are here . . . I would say this has been the best representation that I have seen. But I really mean that.

Transcript of Settlement Approval Hearing, September 17, 1999 at p. 11. In re: Unisys Corporation, Civil Action No. 99-5333 at 8 (E.D. Pa. Dec. 6, 2001), Judge Newcomer wrote:

> Further, counsel has conducted this litigation with skill, professionalism, and extraordinary efficiency.

See Berger & Montague firm resume at Exhibit "D" to the Switzenbaum Decl.

Schatz & Nobel is a smaller firm with seven attorneys located in Connecticut. Established in 1995, the firm has garnered extensive experience litigating securities class actions and will provide able assistance as Co-Lead Counsel. See Schatz & Nobel firm resume at Exhibit "E" to the Switzenbaum Decl.

Thus, the Court may be assured that, in the event this motion is granted, the members of the Class will receive the highest caliber of legal representation available.

### III.
### CONSOLIDATION

28

Consolidation pursuant to Rule 42(a), Fed. R. Civ. P., is appropriate when actions involve common questions of law and fact. Moore, <u>Manual for Complex Litigation</u>, §20.123, at 13-14 (3d Ed. 1995). Rule 42(a), provides that:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial or any or all of the matters in issue in the action; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Consolidation is common in federal securities class action cases. <u>In re Cendant Corporation Litigation</u>, 182 F.R.D. 476, 478 (D.N.J. 1998). Indeed, Section 21D(a)(3)(B) of the Exchange Act contemplates the consolidation of multiple actions "asserting substantially the same claim or claims." Moreover, "[n]either Rule 42 nor the PSLRA demands that actions be identical before they may be consolidated." <u>In re Cendant Corporation Litigation</u>, 182 F.R.D. 476, 478 (D.N.J. 1998).

"In securities actions where the complaints are based on the same 'public statements and reports'", as here, "consolidation is appropriate if there are common questions of law and fact and the defendants will not be prejudiced." <u>Werner v. Satterlee, Stephens, Burke & Burke</u>, 797 F. Supp. 1196, 1211 (S.D.N.Y. 1992) (quoting <u>Lloyd v. Industrial Bio-Test Laboratories, Inc.</u>, 454 F. Supp. 807, 812 (S.D.N.Y. 1978)). <u>Accord</u>, <u>e.g.</u>, <u>In re Olsten Corp. Sec. Litig.</u>, 3 F. Supp.2d 286, 292 (E.D.N.Y. 1998). Further, "the facts

and legal issues need not be identical to warrant consolidation." Olsten, 3 F. Supp. 2d at 293.

Consolidation of the cases is appropriate here. Each of the actions is based on substantially similar events and makes the same legal claims under the federal securities laws. The interests of economy and justice therefore militate strongly in favor of a consolidation order. The proposed Order accompanying Movants' motion consolidates these actions and establishes procedures governing consolidated pleadings and pretrial proceedings for the orderly conduct of this litigation. Compare, Manual For Complex Litigation, §§41.2 & 41.31.

## CONCLUSION

For all the foregoing reasons, the Spadafora Group respectfully requests that the Court: (i) appoint William H. Spadafora, Thomas Tarla, Dallas Beecham and Carrol Beene as Lead Plaintiffs; (ii) approve their selection of Berger & Montague and Schatz & Nobel as Co-Lead Counsel; (iii) consolidate the cases;

and (iv) grant such other relief as the Court may deem just and proper.

Dated: July 9, 2002

Respectfully submitted,

**BERGER & MONTAGUE, P.C.**

By:_____
    Sherrie R. Savett, Esq.
    Robin Switzenbaum, Esq.
    1622 Locust Street
    Philadelphia, PA 19103
    (215) 875-3000 (telephone)
    (215) 875-4604 (facsimile)

**Proposed Co-Lead Counsel**

Andrew M. Schatz, Esq.
Nancy A. Kulesa, Esq.
**SCHATZ & NOBEL, P.C.**
330 Main Street, 2nd Floor
Hartford, CT 06106-1851
(860) 493-6292 (telephone)
(860) 493-6290 (fax)

**Proposed Co-Lead Counsel**

352141.wpd